## WILLIAMSON et al. v. KROHN.

(Circuit Court of Appeals, Sixth Circuit. February 25, 1895.)

No. 227.

1. TRUSTS—FRAUD—TRUSTEE DEALING FOR HIS OWN ADVANTAGE.

N. and three associates, who held all the issued stock of the C. Bridge Co., amounting to $1,500,000, the same having been subscribed but not paid for, made an agreement with one K., in consideration of the cancellation of a contract for the construction of the bridge, in which K. was interested, by which they agreed to assign to him an 8 per cent. interest in the bridge company. Subsequently, N. and W., two of the associates, were authorized by the corporation to use its bonds, and by the stockholders to use their stock, in making a contract for the construction of the bridge. They made a contract with the K. Co. to construct the bridge for $1,000,000 of the bonds of the bridge company and the $1,500,000 of stock, which was to be deemed paid up by the execution of the K. Co.'s contract, it being stipulated that $200,000 of the stock should be returned to N. and W. for their services in organizing the bridge company. Simultaneously, they made another contract with the K. Co., by which they agreed to procure certain land, needed for approaches to the bridge, for $300,000 and $600,000 of the stock of the bridge company, the K. Co. agreeing to furnish them $300,000 in cash and deliver to them the $600,000 stock. The $300,000 was expected by N. and W. to be sufficient to secure the land, and they, in fact, did afterwards secure it for $250,000. N. and W. informed K. of the first contract, and told him they had saved $200,000 of the stock, but said nothing to him of the second contract, or of the $600,000 in stock. They offered K. 8 per cent. of the $200,000 stock, and obtained from him, in consideration thereof and of payment in cash of another claim of K., a receipt in full of all claims whatever. When he afterwards discovered the existence of the second contract, K. tendered back to N. and W. the money he had received on the settlement, and demanded 8 per cent. of the $600,000 stock. *Held,* that N. and W. were charged with a trust in behalf of K., and could not derive an advantage to themselves, to his prejudice, and, accordingly, that K. was entitled to a decree requiring them to transfer to him his share of the $600,000 in stock.

2. EQUITY—PARTIES—SUIT TO COMPEL TRANSFER OF STOCK.

*Held,* further, that, as the stock was the property of the individual parties who were before the court, the C. Bridge Co., though a proper, was not a necessary, party to the suit. Swan, District Judge, dissenting.

3. FEDERAL COURTS—JURISDICTION—CITIZENSHIP OF CORPORATION.
    A corporation formed by the consolidation of two corporations of different states may be sued in the federal courts, as a citizen of one of such states, by a citizen of the other.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This was a suit by Louis Krohn, a citizen of Ohio, against John A. Williamson and R. W. Nelson, citizens of Kentucky, and the Central Railway & Bridge Company, a consolidated corporation of Ohio and Kentucky, to compel the assignment of certain stock in said bridge company. The circuit court rendered a decree against the individual defendants, and dismissed the bill as to the corporation. 62 Fed. 869. Defendants Williamson and Nelson appeal. Affirmed.

The bill in this case was filed by the complainant, Louis Krohn, for the purpose of compelling the defendants Williamson and Nelson to transfer to him $48,000, par value, of the capital stock of the Central Railway & Bridge Company, and to require the said company to transfer the stock upon its books, and issue a certificate therefor to him. Such was the principal object of the suit. The facts upon which this relief is asked, and as found by this court, appear from the pleadings and proof in the case to have been substantially as follows: The Central Railway & Bridge Company was, as alleged in the bill, a corporation organized under the laws of Kentucky, with an authorized capital stock of $2,500,000, for the purpose of constructing, maintaining, and operating a bridge from the city of Newport, in Kentucky, to the city of Cincinnati, in Ohio. It was in fact a corporation constituted under the laws of Kentucky and Ohio by the consolidation of a Kentucky corporation of the same name and an Ohio corporation, both of which original corporations were organized for the same purpose, that is, of building and operating the bridge. The defendants Williamson and Nelson, together with two other persons, John W. Kirk and L. R. Hawthorn, had subscribed for and were the holders and owners of $1,500,000 of the stock of said corporation, which was all of the stock then taken, and no part of which had been paid for. Prior to October, 1889, the company had entered into a contract for the construction of its bridge with the Ohio River Construction Company, in which latter company Krohn had an interest. For some reason not material to the present purpose, the construction company had not made much progress in the work, the only outlay appearing to have been $336, furnished by Krohn for the construction of a pier, to prevent the lapse of rights secured to the bridge company by an ordinance of the city of Newport. The construction company failed to execute its contract, and it was at length abandoned. Thereupon Krohn was taken into the Central Railway & Bridge Company by an assignment to him of an 8 per cent. interest therein by all the shareholders of that corporation. The assignment was in writing, of which the following is a copy:

"We, the undersigned, hereby agree to assign to Louis Krohn the same interest in the Central Railway & Bridge Company that said Krohn now holds in the Ohio River Construction Company, which it is agreed is eight per cent., the said Krohn to bear his proportion of future expenses incurred by the Central Railway & Bridge Company whenever the other holders of stock in said bridge company contribute to said expenses their proportion; the consideration hereof being the cancellation of the contract between the Ohio River Construction Company and the Central Railway & Bridge Company, in which said Krohn is interested.                    [Signed]        R. W. Nelson.
                                                       "John W. Kirk.
                                                       "John A. Williamson.
                                                       "L. R. Hawthorn.

"Newport, Ky., Oct. 23, 1889."

One C. B. Simrall, another party interested in the Ohio River Construction Company, to the extent of 5 per cent. of its capital, was at the same time

taken in under a similar contract. The Central Railway & Bridge Company encountered great difficulty and embarrassment in making any adequate provision for building its bridge, and, after adopting various expedients which failed, the stockholders united with the company in authorizing the defendants Williamson and Nelson, who were the president and vice president of the company, respectively, to use the stock and the resources of the company in making a contract for the construction of the bridge. Those gentlemen proceeded to Cleveland, Ohio, and opened negotiations for such a contract with the King Iron-Bridge & Manufacturing Company for that purpose. They gave the King Company an option for its acceptance within a specified time of a contract which they offered to that company. While these negotiations were pending, Williamson and Nelson bought in Simrall's interest in their company for $261. They also endeavored to buy Krohn's interest, but failed. On March 31, 1890, they concluded a contract, in the name of the Central Railway & Bridge Company, with the King Company for the construction of the bridge and the acquisition of the necessary lands for the approaches thereto. The contract was in writing, and by it the King Company agreed to build the bridge and furnish the money for purchasing the land, materials, and labor necessary for providing the approaches for the consideration of $1,000,000 of the bonds of the railway and bridge company, secured by mortgage of its entire property, and the $1,500,000 of subscribed stock, which was by the terms of the contract to be deemed paid up by the execution of the covenants of the King Company. It was further stipulated in the contract that the King Company should return $200,000 of the paid-up stock of the railway and bridge company to Williamson and Nelson in compensation for their services in securing the organization of that company and obtaining its privileges and franchises.

On the same day, and in connection with the preceding contract, Williamson and Nelson and D. P. Eells, of Cleveland, entered into another contract with the King Company, which recited the other, and thereby agreed with that company to procure the land for the approaches to the bridge for $300,000 and $600,000 of the stock of the Central Railway & Bridge Company, as specified in the contract. But it was estimated by the parties to the transaction that the cost of executing the contract would not exceed the sum of $300,000, and Williamson, Nelson, and Eells entered into a guaranty with the King Company that the cost should not exceed that sum. Eells, though a party to this contract, had no actual interest in the $600,000 of stock, and a little later made a formal assignment to Williamson and Nelson of all his rights thereto. On their return to Cincinnati, Williamson and Nelson informed Krohn of the first-mentioned contract with the King Company, and that they had saved $200,000 of the stock, which they proposed to divide with him, giving him 8 per cent. thereof. They said nothing to him, however, of the other contract. They insisted upon his giving them a receipt in full of all claims whatsoever. Krohn was not willing to give such a receipt, insisting that, among other things, he was entitled to receive the $336 which he had advanced for the Ohio River Construction Company, and interest. This not being conceded, Krohn consulted an attorney, and was preparing to bring suit against Williamson and Nelson. Suit being threatened, they concluded to acquiesce in his demand, and assigned to him 8 per cent. of the $200,000 of stock and paid him $1,050 to cover his original demand, and also the counsel fees and expenses he had incurred in preparing to bring his suit, which he then also insisted upon. On this being done, Krohn executed and delivered to them the receipt they had demanded, and which was as follows:

"Received of R. W. Nelson, John W. Kirk, John A. Williamson, L. R. Hawthorn, and the Central Railway and Bridge Company sixteen thousand dollars of the capital stock of the Central Railway & Bridge Company, in full satisfaction and discharge of all obligations against them and each of them, and especially as regards an obligation dated October 23d, 1889, of which the paper on the face of which this is written is a true copy. And, also, the sum of $1,050 and interest, in full of all claims whatsoever to date, March 16, 1892.
"Louis Krohn."

Krohn at the time of giving this receipt had no knowledge of the contract between the King Company and Williamson, Nelson, and Eells, and the as-

signment of his interest therein by Eells, whereby the $600,000 of the Central Railway & Bridge Company stock was returned to Williamson and Nelson. These gentlemen proceeded with the execution of their contract with the King Company for the procurement of the lands for the approaches to the bridge, and accomplished it at an expense of about $250,000, being some $50,000 less than the $300,000 specified in the contract. Williamson received of this $5,040 for his services in that matter, and Nelson, who acted therein as counsel, being a lawyer, the sum of $6,250. In their settlement with Eells, some $5,000 was turned over to him as his share of the profits. Just how much Williamson and Nelson made out of the contract, to say nothing of the $600,000 of stock, does not clearly appear. After the lapse of some time, in consequence of disclosures made in the progress of a suit between Simrall and Williamson and Nelson, growing out of their dealings with him, Krohn became informed of the contract between Williamson, Nelson, and Eells and the King Company for obtaining the land for the approaches, and the disposition which had been made of the $600,000 of stock of the Central Railway & Bridge Company. On learning of that transaction, Krohn tendered back what he had received in money on the settlement above mentioned, and demanded from Williamson and Nelson an assignment of 8 per cent. of the $600,000 of stock which they had received, his claim being that they acted as his trustees in reference to his interest in the shares of the corporation, and that the $600,000 of stock was not in fact used in the contract which they negotiated for the Central Railway & Bridge Company and its stockholders with the King Company. His claim was rejected, and he thereupon brought this suit. The court below sustained the bill, and decreed an assignment by Williamson and Nelson to Krohn of $48,000 of the stock, being 8 per cent. of the $600,000, but dismissed the bill as to the Central Railway & Bridge Company, upon the view that that was the Kentucky constituent of the consolidated corporation of the same name, and that the stock sought to be recovered was not the stock of the original Kentucky corporation. Williamson and Nelson have appealed.

John W. Warrington, W. W. Cleary, and George Washington, for appellants.

William Goebel, for appellee.

Before LURTON, Circuit Judge, and SEVERENS and SWAN, District Judges.

SEVERENS, District Judge, having stated the facts of the case as above, delivered the opinion of the court.

It is not important, as we think, to determine with precision the question, somewhat discussed upon the argument of this case, whether the effect of the assignment of an interest of 8 per cent. in the Central Railway & Bridge Company by Williamson, Nelson, Kirk, and Hawthorn to Krohn on the 23d day of October, 1889, transferred the legal title to a proportionate number of the $1,500,000 shares of stock which had been subscribed for by them, or only an equitable title therein; for the consequences would be the same upon either construction, so far as the purposes of the present suit are concerned. The assignment would be deemed to cover that stock, for the reason, among others, that it was the only interest about which the assignors had the power to contract. If only an equitable interest therein was assigned, Krohn had the right to have the legal title transferred to him by an issue of the proper certificates therefor. That being so, a court of equity would treat that as done which the complainant had the right to have accomplished. "What ought to be done, is considered in equity as done;"

and the meaning of that is, that, whenever the holder of property is subject to an equity in respect of it, the court will, as between the parties to the equity, treat the subject-matter as if the equity had been worked out, and as impressed with the character which it would then have borne." Adams, Eq. 135.

The complainant, with the other shareholders, co-operating with the Central Railway & Bridge Company, whose purpose it was their object to promote, placed their shares of stock under the control of the defendants Williamson and Nelson, with power to dispose of them as a consideration, or in part consideration, for the construction of a bridge, that being the prime object to be attained. Those persons were thereupon charged with a trust, not only in behalf of the corporation, but of each stockholder, as well, who had placed his stock at their disposal for the purpose of effecting the common object. Their action in dealing with the stock must be regarded as subject to the rules and principles which apply to persons standing in that relation. The trustee must act in strict fidelity to his principal. He is not at liberty to exercise his powers in such a way as to derive an advantage to himself to the prejudice of his principal, and, if he does so, the principal is entitled to call upon him to surrender all the fruits he has gathered. Ringo v. Binns, 10 Pet. 269; Fosbrooke v. Balguy, 1 Mylne & K. 226; Pooley v. Quilter, 2 De Gex & J. 327; In re Bloye's Trust, 1 Macn. & G. 488; Kimber v. Barber, 8 Ch. App. 56; Charter v. Trevelyan, 11 Clark & F. 714; Tyrrell v. Bank, 10 H. L. Cas. 26; Powell v. Powell, 80 Ala. 11; Baugh's Ex'r v. Walker, 77 Va. 99; Armstrong v. Elliot, 29 Mich. 485. Applying this well-established doctrine of courts of equity to the transaction of the appellants, in behalf of the corporation and the stockholders thereof, with the King Iron-Bridge & Manufacturing Company, it is impossible to sustain the right claimed by the appellants to appropriate to their own use that part of the $600,000 of stock which the complainant had intrusted to them for a particular purpose, if it was not bona fide used for that purpose. Admitting this, the appellants insist, nevertheless, that their conduct was not open to censure, and that they acquired the title to the stock in question by legitimate means. It is necessary, therefore, to investigate the means by which the result was, as they claim, brought about. The contract which they negotiated in behalf of their principals with the King Company was in terms to pay $1,000,000 in first-mortgage bonds and $1,500,000 of the paid-up capital stock of the Central Railway & Bridge Company for the construction by the King Company of the bridge and its approaches, and the obtaining title to the land required for those constructions. To begin with, they inserted in that contract a stipulation for the return to them of $200,000 of the stock which was by the terms of the contract to be deemed paid up, in compensation for their personal services in organizing and promoting the corporation. This $200,000 of stock was not in truth any part of the consideration to be paid to the King Company, but was returned to the agents of the other party for the personal benefit of the agents. The King Company did not owe

the appellants for their services, and that part of the transaction was wholly foreign to the business and duties with which the appellants stood charged. Cotemporary with the construction contract was another contract, which was part of the same transaction, whereby the appellants personally undertook to secure the land for the approaches to the bridge for the sum of $300,000 in cash, or its equivalent, and $600,000 of the Central Railway & Bridge Company stock, which, by passing through the other contract, was to be treated as paid up. These contracts, being executed at the same time, and one being recited as in consideration of the other, are to be read and treated as one. The evidence leaves no room for doubt that the $300,000 in cash was regarded by all the parties as ample for the purpose of buying the land they agreed to secure, and in the sequel it turned out that the appellants made a good profit in the bargain which they secured for themselves in connection with and as part of the contract they made for their principals, even if the cash alone were to be treated, as we think it must be, as the whole of the actual consideration of their bargain. And it is incredible that they supposed that they were really being paid by the King Company this $600,000 of paid-up stock, in addition to the sum of $300,000, for the securing of land, which latter sum was supposed to be, and in reality was, its full cost and more. Having already received a sufficient sum to pay all their outlay, and ample consideration for their personal services in performing the contract, they could not demand a further sum for profit. The utmost they could require was indemnity; and this, it is demonstrated, they have already received without any use of the stock. It was in fact not used by the appellants as a consideration in the contract they made in behalf of the principals with the King Company, and hence there is no foundation in that contract upon which they could build a title to it. It seems manifest to us that the result of the transaction cannot be reconciled with the principles upon which the court is required to act. We are unable to understand upon what consistent theory the appellants reported to Krohn that they had saved the $200,000 of stock through the construction agreement, and thereupon divided it with him, when in fact it was claimed by them as having been received for a debt due to them personally, and in which Krohn had no interest whatever. It may be that this was right because they had no authority to use the stock for settling their claim against the corporation, if they had any; but there is nothing in the evidence from which we are permitted to find that the stock was surrendered to Krohn for any such reason. The unavoidable inference is, taking into account the withholding of the fact that $600,000 of the stock had been received by them through the other agreement, that they let him in to share the $200,000 of stock to pacify him, and divert him from further inquiry. Perhaps they justified this to themselves upon the fact—for it no doubt was the fact—that it was through their skill and persistent energy that the building of the bridge was secured without having a dollar in the treasury of the corporation available for the purpose. But it is too obvious to require

further remark that the court cannot sanction such a method of settling one's claims as was here adopted, if that was the view upon which the appellants proceeded.

A question was suggested at the hearing whether the Central Railway & Bridge Company was not a necessary party to the suit, and the case of Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154, was referred to. But we are satisfied that while the corporation was a proper party, in order to completely realize all the objects of the bill by securing a transfer of the stock upon its books, it was not a necessary party. It is not a case of dealing with the unissued stock of the corporation. The stock to which the controversy relates was, at the time of the transaction involved, not the property of the corporation, but of the stockholders to whom it had been issued, who in turn were indebted to the corporation for the par value thereof. The fact that the appellants were also acting in these transactions as the agents and trustees of the corporation does not alter the fact that the stockholders had each contributed a separate property, to be used, if need be, for the common purpose upon a trust, clearly implied, to return it if it should not be required for such purpose. The trust which the bill is brought to enforce would then be completely executed. "When the trust is ended, and the authority of the trustee as such ceases, it is his duty to restore the property to the persons who are then entitled to it either by the terms of the instrument or by operation of legal rules; to accomplish this object, he is bound to make such conveyances as the parties may require in order to vest the title in them." 2 Pom. Eq. Jur. § 1065. The corporation and the appellants may settle their affairs without the presence of the present complainant, and the corporation has no concern with the question who is the owner of the stock in controversy. The case of King v. Barnes, 109 N. Y. 267, 16 N. E. 332, was a case involving similar questions, and the reasoning of the court clearly supports the view we adopt. The case of Crump v. Thurber, above cited, is not applicable. The observation there made by the court, that the corporation was a necessary party to the suit, had reference to the particular status of that case. The suit was brought in a state court against a corporation of the same state and a stockholder therein who was a nonresident, beyond the reach of process. The nonresident stockholder was proceeded against by publication of notice as being one who asserted a claim to the stock in controversy. Since, in that state of the case, the court had no power to render a personal decree requiring the stockholder to transfer the stock, the only relief obtainable was a decree against the corporation to compel it to transfer the stock on its books, and for such relief it is obviously quite true that the corporation was an indispensable party. The case is not an authority for the general proposition that the corporation is a necessary party to a suit between parties contending for the ownership of its issued stock.

At the hearing in the court below the bill was dismissed as to the defendant corporation. This was done apparently upon the ground that, as assumed, it was the original Kentucky corporation, and not

the consolidated company, whose stock was the subject of the controversy. We think this was a misapprehension. It is true the corporation is alleged to be one organized under the laws of Kentucky. But this is an apt and proper description of the consolidated company. It was also organized under the laws of Ohio. For the purposes of the present suit, however, it was rightly sued by its corporate name as a Kentucky corporation. The subpoena for the defendant corporation was served upon the president of the consolidated corporation, and the bill alleged a controversy about its stock. It is clear from the record that this corporation was the one sued, and not the original Kentucky corporation which, had been merged therein. Nor did the fact that the consolidated corporation was a defendant oust the jurisdiction of the court. It was competent for the complainant to sue it as a citizen of Kentucky, notwithstanding the fact that it was also consolidated under the laws of Ohio. Muller v. Dows, 94 U. S. 444; Pennsylvania R. Co. v. St. Louis, A. & T. H. R. Co., 118 U. S. 290, 6 Sup. Ct. 1094; Nashua & L. R. Corp. v. Boston & L. R. Corp., 136 U. S. 356, 10 Sup. Ct. 1004. But the complainant has not appealed from the decree, and it is difficult to find any ground upon which the appellants can be heard to complain of the dismissal of the bill as to the corporation. They assign it as erroneous. But no injury to them is apparent. If occasion should ever arise to determine any question between the corporation and the holders of this $600,000 of stock, nothing here adjudged will affect such question, the only question here determined being one of the ownership of the 8 per cent. of $600,000 of stock as between the complainant and the appellants.

The defense that a settlement has taken place, and a receipt in full of all claims been given by Krohn, requires but little to be said. It is manifest that when the settlement took place he had no knowledge of the wrong of which he complains, and supposed that all the rest of the stock had gone into the consideration paid for construction. Not only was this so, but the truth was actually concealed from him by the parties who then had his stock, and were settling with him for a smaller block of the stock, which they professed was the amount saved from the execution of their trust. It is not pretended that any mention of the $600,000 of stock was made, or that any settlement for Krohn's share of it was actually made. The substance of the contention is that the receipt must be construed to cover it. It is no doubt broad enough in its terms, but is very obnoxious to the rule that such an instrument, when given under a mistake of fact, and especially when the mistake is induced by the other party, does not preclude the party making it from recovering according to the fact. Farnam v. Brooks, 9 Pick. 212; Parker v. Nickerson, 112 Mass. 195; Kimber v. Barber, ubi supra; Pom. Eq. Jur. § 959. It is further to be observed that the fact that fiduciary relations existed between the parties imposed an active duty upon the appellants to disclose the whole truth. We are of opinion that the decree below should be affirmed, with costs, and it is so ordered.

SWAN, District Judge (dissenting). I agree that, in a proper proceeding, complainant would be equitably entitled to the relief sought against defendants Williamson and Nelson; but, in my opinion, the corporation in whose stock complainant claims an interest is a necessary party to this suit, as upon it the decree must operate. It is not enough that complainant's right to the stock in controversy is established against the individual defendants, but the duty of the corporation to transfer the stock should also be adjudged, and this cannot be done without its presence. The dismissal of the bill against the corporation deprived the court of the power to grant the relief prayed. Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154; Railway Co. v. Wilson, 114 U. S. 60, 5 Sup. Ct. 738.